# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LILLIAM GONZALEZ CAMACHO, JAVIER CARMONA, his wife DOLORES S. GARCIA and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM, LYDIA REYES RAMOS; WILLIAM AGOSTO MANSO, MARILYN FERNANDEZ MORALES and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM; SANTA ORTIZ SALINAS, HAYDEE RODRIGUEZ NICHOLS, JOSE ANTONIO FLORES CRUZ, EDNA LOPEZ VELAZQUEZ and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM; GERARDO CECILIO GARZA RODRIGUEZ, IVETTE MIGDALIA RIVERA BERNABE, FERNANDO A SOSA BETANCES, IDE ZENAIDA VALCARCEL OSORIO; THE ESTATE OF CARLOS GONZALEZ MARTINEZ constituted by NORMA MARGARITA MONZON RICARDI; ALBA IRIS CARRASQUILLO FRAGOSO, ISRAEL RODRIGUEZ VAZQUEZ, NEREIDA SEPULVEDA ROLON and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM; ANTONIO ESTRUCHE  ROMAN, BRENDA VIMARI SANTOS RIVERA,EDGAR BASTARDO AGUILAR, RUSSIN DELGADO MARQUEZ and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM; EDGAR ANTONIO CANCEL ZAPATA, MARIA E. BERRIOS SANTOS and the CONJUGAL PARTNERSHIP BETWEEN THEM; FRANCISCO JAVIER ORTIZ RIVERA, WANDA IVETTE ESTELA RIVERA and the CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN THEM; GLORIA MARIA TAPIA DE JESUS,  ANTONIO VELEZ | **CLASS ACTION**<br><br><br>**CIVIL NO. 17-1448**<br><br>COMPLAINT FOR:<br><br>TRUTH IN LENDING REAL ESTATE SETTLEMENT PROCEDURE ACT, REGULATION X HARP, HAMP, SUPLEMENTAL JURISDICCTION.<br><br>**DEMAND FOR JURY TRIAL** |

MARTINEZ, GLORISSA CORDERO
CABRERA and the CONJUGAL
PARTNERSHIP CONSTITUTED
BETWEEN THEM; HECTOR SANABRIA
SANABRIA, JORGE LUIS KUILAN
RODRIGUEZ, NORMA IRIS PAGAN
MONTALBAN and the CONJUGAL
PARTNERSHIP CONSTITUTED
BETWEEN THEM; JOSE ANTONIO
MILLAN QUIÑONES, ANDREA MATOS
BENITEZ and the CONJUGAL
PARTNERSHIP CONSTITUTED
BETWEEN THEM; MARILYN FONSECA
COTTO, MARGARET DE JESUS
CANDELARIA, CONCEPCION
HERNANDEZ FALERO, SOL MARIE
LOPEZ  HERNANDEZ, NYDIA EDELYS
MORALES MIRANDA, PEDRO IVAN
NIEVES RODRIGUEZ, SONIA LINNETTE
ROMERO RAMOS; JAVIER ROLON,
MARIA DE LOURDES PIÑERO
IRIZARRY

PLAINTIFFS

                VS

UNITED STATES OF AMERICA (FARM
SERVICE AGENCY), UNITED STATES
DEPARTMENT OF AGRICULTURE
RURAL DEVELOPMENT, FEDERAL
HOME LOAN MORTGAGE
CORPORATION (FREDDIE MAC),
FEDERAL MORTGAGE ASSOCIATION
(FANNIE MAE), WELLS FARGO &
COMPANY, RUSHMORE LOAN
MANAGEMENT SERVICES, ROOSEVELT
CAYMAN ASSET COMPANY II, JAMES
B. NUTTER & COMPANY, LAKEVIEW
LOAN SERVICING LLC, LIME
RESIDENTIAL LTD, BAYVIEW LOAN
SERVICING LLC, RNPM LLC, TRM LLC,
LIHMAN RE LIMITED A BERMUDA
CORPORATION, COOPERATIVA DE
AHORRO Y CREDITO LAS PIEDRAS,
BANCO POPULAR OF PUERTO RICO,

SCOTIABANK OF PUERTO RICO,
BANCO SANTANDER DE PUERTO RICO,
ISLAND FINANCE CORPORATION,
ORIENTAL BANK PUERTO
RICO,OPERATING PARTNERS LLC,
UNKOWN DEFENDANTS, UNKOWN
INSURANCE AGENCIES.

DEFENDANTS

## COMPLAINT

**NOW COMES THE PLAINTIFFS and prays as follow.**

### JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because there are at least 100 Class Members in the proposed Class, the combined claims of proposed Class Members exceed $5,000,000 exclusive of interest and costs, and at least one Class Member is a citizen of a state other than Defendants' state of citizenship.

Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted herein occurred in this district, and Plaintiffs dealt with Defendants, which are located in and/or do business in this district. Venue is proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avails themselves of the markets in this District, through the promotion, sale, and marketing of their services in this District.

Plaintiffs also seek supplemental jurisdiction on state law claims under Law No. 169 of August 9, 2016 and Law No. 184 of August 17, 2012, and Articles 1802 and 1803 of the Commonwealth of Puerto Rico Civil Code, Puerto Rico Laws Annotated, Title 31, Sections 5141 and 5142.

## PARTIES

Plaintiffs are residents of Puerto Rico and the United States of America, with real estate properties located in Puerto Rico.

Unknown Plaintiff is any person with a real estate property located in Puerto Rico and guaranteed by a mortgage loan serviced by the Defendants and that can be subject of the allegations contained in the present claim.

Defendants are banks, mortgage loan servicers dedicated to provide mortgage loans to qualified individuals with offices, branches and subsidiaries in Puerto Rico.

Unknown Defendants are any bank, financial institutions and mortgage loan servicers dedicated to provide mortgage loans to qualified individuals with offices, branches and subsidiaries in Puerto Rico and that can be liable for the actions alleged in this claim.

## BACKGROUND TO THE RESIDENTIAL MORTGAGE CRISIS

Toward the end of 2007 and throughout 2008, the residential real estate market collapsed, causing a tailspin that drove the economy into recession.

Because lenders made extravagantly wrong bets on asset-backed securities, they found themselves on the brink of financial collapse and had to be bailed out with $45 billion from the federal government's Troubled Asset Relief Program ("TARP").

In response to the foreclosure crisis, President Obama introduced the Financial Stability Plan on February 10, 2009, to help prevent foreclosures and restructure troubled mortgage loans.

As part of the plan, on March 4, 2009, the U.S. Treasury introduced the Home Affordable Modification Program, which provided guidelines for mortgage servicers to adopt to modify loans for homeowners in financial need, including the following:

• Servicers will receive an up-front Servicer Incentive Payment of $1,000 for each eligible modification meeting guidelines established.

• Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative foreclosure prevention options.

• *The trial modification period will last 90 days* (three payments at modified terms) or longer if necessary to comply with investor contractual obligations. The borrower must be current at the end of the trial period to obtain a Home Affordable Modification.

• The servicer must inform borrowers of the availability and advantages of counseling and provide a list of local HUD-approved counselors and that counseling is a requirement of the modification terms.

• There are no modification fees or charges borne by the borrower.

• *Unpaid late fees will be waived for the borrower.* These include late fees prior to the start of the trial period and accrued during the period.

• Compensation is provided to the servicer that performs the loss mitigation or modification activities. Upon modification following successful completion of the trial period, and contingent on signing the program servicer agreement, the servicer will receive an incentive fee of $1,000 for each eligible modification meeting HAMP.

• For loans modified while still current, the servicer will receive a Current Borrower One-Time Incentive of $500 following successful completion of the trial period.

• When promoting or describing loan modifications, *servicers should provide borrowers with information designed to help them understand the modification terms that are being offered and the modification process. Servicers also must provide borrowers with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions*.

• *Servicers should have procedures and systems in place to be able to respond to inquiries and complaints relating to loan modifications. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution*.

• Servicers will be required to maintain records of key data points for verification/compliance reviews.

• Servicers will be required to collect and transmit borrower and property data in order to ensure compliance with the program as well as to measure its effectiveness. (Emphasis added.)

## NATURE OF THE ACTION

Plaintiffs bring this class action on behalf of themselves and a class of persons ("Class Members") who have been subject to illegal foreclosures and/or sought modifications to their mortgage payments through their mortgage servicers, and/or Defendants.

Plaintiffs contacted Defendants to reduce the loan payments on theirs loans due to a reduction in hours at their jobs and/or loss of their job and other situations that affected their payment capacity. The Defendants and/or their mortgage servicers represented it would help by submitting Plaintiffs to their loss mitigation process, putting Plaintiffs in a trial mortgage modification program that would become permanent if Plaintiffs made reduced payments during

the three-month trial period and/or simply negating Plaintiffs of their right to be qualified for a loan modification under HARP and HAMP programs and local state laws.

Despite Plaintiffs making the monthly reduced payments that Defendants asked them to make, and complying with Defendant's requests for various documentation, Plaintiffs found themselves hounded by Defendants a few months later for a delinquency, their credit-worthiness ruined, and rejected for permanent loan modification.

Plaintiffs' story is typical. Defendants did not live up to its promises of providing borrowers with reduced loan payments and/or simply submit Plaintiffs to a lengthy Loss Mitigation Process with no result and at the same time filing a foreclosure claim against them. This constitutes dual tracking and is prohibited by law. Moreover, consumers emerged from the trial modification in worse shape than they entered it, despite doing everything the Defendants requested of them.

In March 2009, in reaction to the rising tide of foreclosures, the United States Treasury introduced the Home Affordable Modification Program ("HAMP"), to be implemented by loan servicers and banks. The HAMP supplemented various other modification or forbearance plans offered by servicers, including the Defendants.

When Plaintiffs began having trouble making their regular loan payments, they contacted the Defendants to find out if they were eligible to enter the widely-advertised modification programs. The main lure of the HAMP and other Defendants hardship assistance plans to consumers is the stay of foreclosure proceedings and the promise of smaller loan payments. Pursuant to their agreement with Defendants, Plaintiffs and Class Members fulfilled their obligations by submitting the requested paperwork and timely making the modified payments during the trial period, when applicable.

Consumers that were rejected from permanent modification plans through no fault of their own should find themselves in no worse position than they entered it. Instead, Defendant's failure to honor its agreements and its misrepresentations and omissions about a program enacted to help homeowners reduce their payments and keep their homes have left Plaintiffs and Class Members financially devastated.

### Class Allegations

Plaintiffs bring this action on their own behalf and as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following Class:

All persons in Puerto Rico whose loans have been serviced by Defendants and all related actions, have complied with their obligation under a trial loan modification program, have not received a permanent modification pursuant to the loan modification agreement, have been subjected to Loss Mitigation process at the same time that a foreclosure claim is being filed against them and/or have been subject to an illegal foreclosure and harmed thereby.

Plaintiffs and the members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impractical.

This action involves questions of law and fact common to Plaintiffs and all members of the Class, which include:

(a) Whether Defendants breached its contracts and promises with Plaintiffs and the Class Members and their obligations under the HAMP, HARP and other loan modification programs; including state law.

(b) Whether Defendants breached the implied covenant of good faith and fair dealing in permanent modifications to Class Members.

(c) Whether Defendants violated Puerto Rico's Law No. 169 of August 9, 2016, the "Mortgage Debtor Assistance Act";

(d) Whether Defendants violated Puerto Rico's Principal Residence Protection and Mandatory Mediation in Foreclosure Proceedings Act; Law 184 and

(e) Whether Plaintiffs and Class Members sustained damages resulting from Defendant's conduct and, if so, the proper measure of damages, restitution, equitable or other relief, and the amount and nature of such relief.

Plaintiffs understand and are willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or that directly conflict with the interests of the other members of the Class.

Plaintiffs' claims are typical of those of the absent Class Members because Plaintiffs and the Class Members each sustained damages arising from Defendant's wrongful conduct, as alleged more fully herein.

This action is brought under Rule 23 because Defendants have acted on grounds generally applicable to all members of the Class.

Judicial determination of the common legal and factual issues essential to this case would be far more efficient and economical as a class action than piecemeal individual determinations.

Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

Plaintiffs file class-action lawsuits against many mortgage investors and mortgage servicers over alleged foreclosure errors, alleged missing documents, alleged deceptive,

ambiguous, misleading and confusing, business practices, mortgage loan modifications, and other matters.

The whole situation is incredibly distressing for everyone involved, including the borrowers, lenders, present owners of the mortgage loans, loan servicers, and many others. Mortgage lenders granted loans, in many cases, based upon realistically optimistic expectations that the borrowers would be able to make the payments for which they agreed to be responsible, and enabled those borrowers to improve their quality of life by living in better housing than they did before; and in many cases, to become homeowners for the first time. Unfortunately, and primarily due to the direction taken by the national economy, things did not work out as expected for many of these loans; and brought us to the tenuous situation where we are today. The mortgage lending process always has been that a prospective borrower finds a house that he or she wants to buy, and then applies for a mortgage loan to pay for it. The mortgage lender either approves the loan or turns it down. This does not imply a "gatekeeper" role for mortgage lenders whereby the lender decides what housing a borrower should be buying. A prospective borrower is responsible for using prudence and their own knowledge of their overall financial situation – present and future - in determining how much they should be allocating to pay for housing. The mortgage lender does play the role of matching up housing inventory with borrowers that the lender thinks fits the borrowers, and the mortgage lender has responsibility to a borrower to grant them a loan that they will be able to repay. Mortgage lenders granted loans along the lines that prospective borrowers sought.

Personal financial responsibility of the borrowers appears to be totally overlooked in the present crisis. The key to assessing any responsibility to a particular mortgage lender or mortgage servicer is did the lender or servicer operate according to nationwide industry standard

practices in their origination and servicing of the mortgage loans, including their practices in applying payments, assessing late charges, dealing with delinquencies, and in foreclosing when other collection methods failed.

An examination of the mortgage lender's or mortgage servicer's standard operating procedures should indicate whether the company do not exhibited good faith, fair dealing, ordinary care, honesty in fact, and not observed reasonable commercial standards in the handling of the mortgage loans under consideration.

Mortgage loans and underwriting factors can truly create a recognizable class. Consider the following: Numerosity –borrowers on foreclosures or troubled loans that have common problems could negotiate collectively with their lender and utilize litigation to resolve their common problems. Commonality –there is common type of mortgage loan. Typicality – Considering the factors discussed, this is a case to be considered typical.

## PURPOSE OF THE TRUTH-IN-LENDING ACT (TILA)

TILA seeks to assure meaningful disclosure of credit terms and conditions that the consumer will be informed with accurate costs and benefits of their credit transaction, allowing them to shop for the best credit terms available on the market. 15 U.S.C. § 1601(a).

## STANDARD OF LAW

Since TILA specifically remedial in nature, its provisions must be strictly construed. A creditor must comply with TILA in all credit transactions and "misleading disclosure is as much a violation of TILA as a failure to disclose at all." Smith v. Chapman, 614 F.2d 968, 977 (5th Cir. 1980). It is not sufficient to attempt to comply with the Act, but rather, creditors are required to strictly comply with all the requirements of the Act. There is no need to show that the consumer was misled or deceived by ambiguous credit terms in order to prevail. Noel v. Fleet Finance, Inc., 971 F. Supp. 1102 (E.D. Mich. 1997).

Congress did not intend for creditors to escape liability for merely technical violations,

that even minor or technical violations impose liability upon the creditors. <u>Huff v. Steward-Gwinn Furniture Co.</u>, 713 F.2d 67, 69 (4th Cir. 1983). <u>See also</u>, <u>Washington v. Ameriquest Mortg. Co.</u>, 2006 W.L. 1980201 (N.D. Ill.).

**SCOPE**

TILA applies to most consumer credit transactions and was specifically enacted to ensure accurate and meaningful disclosure of the charges involved in a transaction, allowing consumers to make their own decisions about obtaining a loan.

A lawsuit for violation of TILA may be based upon a lenders failure to comply with disclosure requirements. U.S.C. §§ 1631-34. Most of TILA violations involve the creditor's failure to charge the correct amount, failure to disclose all the material terms, or failure to provide necessary forms or documents required by the Act.

TILA does not apply to the following transactions:

1.      Transactions that are made for business, commercial, or agricultural purposes. 15 U.S.C. § 1603(1); Reg. Z § 226.3(a)(1).

2.      Extensions of Credit to Organizations as opposed to natural persons. U.S.C. § 1603(1); Reg. Z. § 2026.3(a)(2).

3.      Credit over $25,000 Not Secured by Real Property or a Dwelling. U.S.C. § 1603(3); Reg. Z. § 226.3(b).

4.      Student Loans. U.S.C. § 1603(7); Reg. Z. § 226.3(f).

5.      Transactions under Public Utility Tariffs. U.S.C. § 1603(4); Reg. Z. § 226.3(c).

6.      Securities or Commodities transactions that are registered with the Securities and Exchange Commission. U.S.C. § 1603(2); Reg. Z. § 226.3(d).

**STATUTE OF LIMITATIONS**

When a violation of TILA occurs, the one-year limitations period applicable to actions for statutory and actual damages begins to run. U.S.C. § 1641(e).

A TILA violation may occur at the consummation of the transaction between a creditor and its consumer if the transaction is made without the required disclosures.

A creditor may also violate TILA by engaging in fraudulent, misleading, and deceptive practices that conceal the TILA violation occurring at the time of closing. Often consumers do

not discover any violation until after they have paid excessive charges imposed by their creditors. Consumers who later learn of the creditor's TILA violations can allege an equitable tolling of the statute of limitations. When the consumer has an extended right to rescind or pursue other statutory remedies because a violation occurs, the statute of limitations for all the damages the consumers seek extends to three years from the date the violation is revealed. McIntosh v. Irwin Union Bank & Trust Co., 215 F.R.D. 26, 30 (D. Mass. 2003).

## TILA AND REGULATION Z

Congress delegated authority for the implementation of TILA to the Federal Reserve Board (FRB). The Board of Governors (the Board) of the FRB interpreted TILA and promulgated a detailed and comprehensive set of rules that sets out the Board's interpretation known as Regulation Z. Regulation Z is an official set of rules and most pleadings alleging TILA violations also alleging violations of Regulation Z as well.

## DISCLOSURE REQUIREMENTS AND VIOLATIONS

1.          **Form Of Disclosure**

TILA requires specific disclosures before the closing of a credit transaction. Disclosures must be "clear and conspicuously, in writing, in a form that the consumer may keep." § 1632(a); § 226.5(a)(1).

Disclosure statement is a written document that a creditor is required to provide the consumer prior to closing, which contains TILA required material terms[1] related to the costs of the credit transaction. In this statement, a creditor must disclose to the person who is obligated on a consumer credit transaction the information required under TILA.

The Act calls for disclosures to be made in a manner that is reasonably to understand by ordinary persons. Most courts agree that "sufficiency of TILA mandated disclosures is to be viewed from the standpoint of an ordinary consumer, not the perspective of a Federal Reserve Board member, federal judge, or English professor." Smith v. Cash Store Mgmt., 195 F.3d 325, 328 (7th Cir. 1999). Edmondson v. Allen-Russell Ford, Inc., 577 F.2d 291, 296 (5th Cir. 1978)

---

[1] Material terms are annual percentage rate, finance charge, method of determining the finance charge and the balance, amount financed, total of payments, the number and amount of payments, due dates or periods of payments scheduled to repay the indebtedness. U.S.C. § 1602(u); Reg. Z. § 226.23 n. 48.

("we must assess the adequacy of disclosure […] by the audience for which disclosure was intended).

**a.     Required Disclosures Must be Clear and Conspicuous**. U.S.C. § 1632(a). Courts usually look at the particular Disclosure Statement and its content to determine whether it was sufficiently clear and conspicuous.

1)     Creditor violates TILA for failure to clearly and conspicuously disclose the requirements by disclosing required information in fine print. There was "nothing in the disclosure statement that would call a person's attention to the relevant clause." Violation found when disclosures were buried near the bottom of the form. Re Wright, 11 B.R. 590, 592 (S.D. Miss. 1981).

2)     TILA violation found where a financial company fails to disclose the cost of credit life and disability insurance in the disclosure statement, making the interest of the loan appear less than its actual cost. Woods v. Beneficial Finance Co. of Eugene, 395 F. Supp. 9, 12 (DC Or 1975).

3)     Disclosures are not clear and conspicuous when the disclosure statement includes contradicting terms. Varner v. Century Finance Co. Inc., 738 F.2d 1143 (11th Cir. 1984) (disclosing two different dollar amounts under the same heading is confusing). See also Andrews v. Chevy Chase Bank, 240 F.R.D 612, 618 (E.D. Wis. 2007) (Disclosure found unclear where the Truth-In-Lending Disclosure Statement shows the APR is 4.047 percent and other disclosure that "strongly implie[s] that the cost of the loan expressed as a yearly rate" at 1.950 percent); Ralls v. Bank of N.Y., 230 B.R. 508, 516 (E.D. Pa. 1999) (where there is a contradiction between TILA disclosures and other information provided by the lender, the disclosures are unclear).

**b.     The terms "finance charge" and "annual percentage rate" (APR) shall be more conspicuous than any other terms**. U.S.C. § 1632(a). These terms can be disclosed more conspicuously by using a contrasting type size or boldness and/or placing borders around them. Commentary § 226.5(a)(2)-2.

1)     Violate for printing the terms "finance charge" and annual percentage rate" in the same typeface as other material terms. Brown v. Payday Check Advance, Inc., 202 F.3d 987, 990 (7th Cir. Ill. 2000). See also, Herrera v. First Northern Sav. & Loan Asso'n, 805 F.2d 896, 898 (NM 1986) (TILA violated when the term "annual percentage rate" appeared on the disclosure statement in identical size, style, and boldness with over 30 other terms and phrases).

2)      No violation where the term "annual percentage rate" appears in a bolded box and is highlighted by all capital and bolded letter." Robinson v. First Franklin Financial Corp., 2006 WL 2540777 (E.D. Pa.).

**c.      TILA disclosures must be grouped together and segregated from all unrelated information**. U.S.C. § 1632(a). Disclosures must be organized in the contrast so that each section of the disclosure statement is complete without any extra information that confuses the consumers. Reg. Z. § 226.5(b)(1).

1)      A paragraph at the bottom of the contract referring to the "property described above" is ambiguous and does not comply with the requirement that disclosures be grouped together. Leathers v. Toyota-Volvo, 824 F. Supp. 155 (C.D. Ill. 1993). See also, In re Cook, 76 B.R. 661, 663 (C.D. Ill. 1987) (information in the disclosure statement referred back and forth violates TILA, because the required disclosures must be simplified and grouped in a single location and segregated from everything else).

2)      Failure to disclose time of payment in the disclosure statement violates TILA because "the timing of payments […] must be grouped with the other required disclosure" such as number of payments and amount of payments. Jones v. Ameriquest Mort. Co., 2006 WL 273545 (N.D. Ill.). See Andrews v. Chevy Chase Bank, 240 F.R.D at 617 (the creditor listed the period of payments in a different place than the number and amount of payments violate TILA requires to group related information together).

**d.      Additional information.** Lenders can include additional information on the disclosure statement so long as the additional information relates to the required disclosures. U.S.C. § 1632(b).

1)      Disclosure of an additional interest rate of 1.950 percent, which only applied to the first monthly payment, in the disclosure statement is violation, because it causes the loan to "appear more attractive than it actually was and serve no useful purpose." Andrews v. Chevy Chase Bank, 240 F.R.D at 620.

2)      Additional information setting out the Note Rate disclosed on the Disclosure Statement found "helpful and important to consumers." Smith v. Anderson, 801 F.2d 661, 663 (Ct. App. Va. 1986).

**e.      The home equity brochure published by the Board or a suitable substitute shall be provided.** U.S.C. § 1637A(e). Creditors are required to provide the consumer with a brochure

prepared by the FRB describing the home equity plans. If a creditor provides a substitute brochure, the brochure must be comparable to the Board's brochure in substance and comprehensiveness. Reg. Z. § 226.5b(e)-1. When a third party has provided the consumer with a brochure, the creditor does not have to give the consumer a second copy of the brochure. Reg. Z. § 226.5b(e)-2.

**2.**     <u>**Time of Disclosures:**</u> "The disclosures and brochure required … shall be provided at the time an application is provided to the consumer."

**a.**     Creditor failed to provide the consumer disclosure statement at the consummation of the credit transaction violates TILA. <u>Family Fed. Sav. & Loan v. Davis</u>, 172 B.R. 437 (D.C. 1994); <u>In re Schweizer</u>, 354 B.R. 272, 281 (Id. 2006).

**b.**     No Violation where the creditor presents to the consumer, prior to the consummation of the credit transaction, a contract with multiple copies and allows the consumer to keep one of the copies before signing the contract. <u>Queen v. Lynch Jewelers, LLC</u>, 55 P.3d 914, 916 (Kan. App. 2002).

**3.**             **Required Disclosures for Open-End Credit Plan**

TILA requires the following information to be disclosed, to the extent applicable. U.S.C. § 1637(a).

**a.**     **Disclosure of the Finance Charge Accrual Date:** The conditions under which a finance charge may be imposed together with either the time period, if any in which the customer may pay without incurring additional finance charges or there is no free ride period. Reg. Z. § 226.6(a)(1).

**b.**     **Disclosure of the Periodic Rate, Range of Balances, and APR:** For each period, a creditor must disclose the periodic rate that will be used to compute the finance charge; the balances to which the rate is applied; the corresponding nominal annual percentage rate; if deferent rates apply to different types of transactions, they must be disclosed; and penalty rate and possible conditions that trigger the penalty rate. Reg. Z. § 226.6(a)(2).

**c.**     **Disclosure of the Periodic Rate, Range of Balances, and APR:** The method used to determine the balance on which the finance charged is imposed, and a complex method calls for a more detailed explanation. Reg. Z. § 226.6(a)(3).

**d.**     **Disclosure of the Finance Charge Amount:** The method used to determine the amount of finance charge, including any minimum or fixed amount. Reg. Z. § 226.6(a)(4).

e.      **Disclosure of Charges Other than Finance Charge:** Identification of other charges which may be imposed and their method of computation in accordance with the FRB regulations. Significant charges such as membership fees, late charges, default charges, charges for exceeding the credit limit of an account, fee for providing copies of documents, taxes imposed on the credit transaction, real estate charges, and other charges must be disclosed. Reg. Z. §§ 226.6(b), 226.4.

f.      **Disclosure of Security Interest:** If a security interest will be secured in connection with the transaction, the collateral must be identified, even if the property is not owed by the consumer. Reg. Z. § 26.2(a)(25).

g.      **Disclosure of Billing Error Right:** A statement as to billing error rights and the right to assert claims and defenses in a form prescribed by the FRB must be provided to the consumer at the consummation of a transaction. Reg. Z. § 226.2(a)(d).

4.      <u>**Required Disclosures of Residential Mortgage Transactions**</u>

Most home mortgages are subject to the disclosure requirements of TILA. U.S.C. § 1638. The required disclosures must be provided to the homeowner prior to the consummation of a credit transaction. Homeowners have the right to rescind most credit transactions, including home equity loans and home improvement loans, in which the home is taken as collateral.

a.      **Disclosure of the Creditor:** The name of the creditor must be provided and the address and/or telephone number are not required but may be included. U.S.C. § 1602(f); Reg. Z. § 226.2(a)(17).

Failure to disclose of the creditor's identity properly entitles the consumer <u>only</u> actual damages, if any.

b.      **Amount Financed:** This term must be used in disclosure statement, and a brief description of the amount financed must be provided. U.S.C. § 1638(a)(2)(A).

Failures to properly disclose the amount financed gives rise to statutory damages, attorney's fees, and any actual damages. Reg. Z. § 1640(a)(3). Its violation may also extend the consumer's right to rescind. U.S.C. § 1602(u); Reg. Z. § 226.23 n. 48.

c.      **Finance Charge:** The term "finance charge" must be used and A brief description must be provided. U.S.C. § 1638(a)(3); Reg. Z. § 226.18(d). It can be disclosed only as a total amount, and there is no requirement to itemize finance charge, and overstating finance charge does not violate TILA. <u>Vandenbroeck v. Commonpoint Mortg. Co.</u>, 22 F.Supp. 2d 677 (W.D. Mich.

1998).

In real estate closing charges, fees may be excluded from the finance charge are real property and title-related fees; document fees; closing agent, attorney fees; and notary, appraisal, and credit report fees. U.S.C. § 1605(e); Reg. Z. § 226.4(c)(7).

**d.** **APR:** The term must be used and disclosure must be accurate. U.S.C. §1638(a)(4); Reg. Z. §§ 226.18(e). The APR is accurately disclosed when it is not more than 1/8 of 1 percentage point (.125%) above or below the actual APR. In variable-rate transactions, the description must inform the consumer that the interest rate is subject to change. A historical example illustrating the effects of interest rate changes implemented according to the loan program may be provided to the borrowers. U.S.C. § 1638(a)(14); Reg. Z. § 226.18(f).

Improper disclosure of the APR is a material violation of TILA that extends the consumer's right to rescind. U.S.C. § 1602(u); Reg. Z. § 226.23 n 48. Statutory damage, attorney's fee, and actual damage are also available. U.S.C. § 1640(a)(3).

**e.** **Payment Schedule:** Payment schedule includes the number of payments, the amount of each payment, and the timing of payments scheduled to repay the obligation. U.S.C. § 1638(5)-(6); Reg. Z. § 226.18(g). Failure to disclose that payments were due monthly violates TILA. <u>Andrews v. Chevy Chase Bank</u>, 240 F.R.D. at 617.

Violation of these requirements entitles the consumer statutory damages, attorney's fees, and actual damages. U.S.C. § 1640(a)(3) Improper disclosure is also a material violation for purposes of rescission. U.S.C. § 1602(u); U.S.C. § 1602(u); Reg. Z. § 226.23 n 48.

**f.** **Total Sale Price in a Sale of Property:** The total of the cash price of the property or services, additional charges, and the finance charge must be disclosed. U.S.C. § 1638(a)(7). Reg. Z. § 226.18(j). Actual damages may be available for violation to disclose this factor. U.S.C. § 1640(a).

**g.** **A statement regarding the taking of the security interest in the property:** The creditor must disclose whether it acquires a security interest in the property being purchased, or in other property, as part of the transaction.

Violate this requirement will give rise to statutory damages, attorney's fees, and actual damages. U.S.C. § 1640(a)(3).

**h.** **Late charges:** The dollar amount or the percentage charge may be imposed for late charge. U.S.C. § 1638(a)(10); Reg. Z. § 226.18(l). Actual damages may be available for failure

to state the late charges. U.S.C. § 1640(a).

**i.**     **Any Rebate Available:** Any funds given to the consumer must be disclose whether it is in the form of cash, check, deposit in a savings or checking account. Reg. Z. § 226.18(r). Actual damages may be available for this violation. U.S.C. § 1640(a).

**j.**     **Disclosure of Reference to Additional Documents:** Information regarding nonpayment, default, and the right to accelerate the maturity of the debt. Prepayment rebates and penalties are not required to be disclosed to simplify the closing process. Instead, the creditor can provide appropriate documents that consumer could refer to. Reg. Z. § 226.17(a)(4). Actual damages may be available for failure to disclose this requirement. U.S.C. § 1640(a).

**5.**     <u>**Required Disclosures for Adjustable Rate Mortgages**</u>

Adjustable rate mortgages (ARMs), which secured by the borrower's principal dwelling with a maturity longer than one year, are required to be disclosed with additional information. To simplify disclosure requirements for variable rate loans, creditors may disclose any variable rate transaction applying the ARMs disclosure rule. However, the reverse is not allowed. Reg. Z. § 226.18(f); 52 Fed. Reg. 48665 (Dec. 24, 1987).

Failure to disclose properly and accurately the requirements of variable rate loans entitles the consumer statutory and actual damages and also rescission right. <u>In re Fidler</u>, 210 B.R. 411 (D. Mass. 1997).

**a.**     **Rate Cap Disclosure:** The maximum interest rate that may be imposed during the term of the obligation must be disclosed to the borrower. Reg. Z. § 226.30(a); Fed. Reg. 45611 (Dec. 1, 1987).

**b.**     **ARM brochure:** The *Consumer Handbook on Adjustable Rate Mortgages*, published by the Board and the Federal Home Loan Bank Board, may be provided to the consumer to fulfill this requirement. Creditors can also provide a suitable consumer handbook that is comparable to the Board's Consumer Handbook in substance and comprehensiveness. Reg. Z. § 226.19(b)(1).

**c.**     **Timing of Disclosures:** The required disclosures and the Consumer Handbook must be provided to the borrower when an application form is furnished or before the payment of a non-refundable fee is made, whichever earlier. Reg. Z. § 226.19(b). Where the borrower receives the application by mail or a third party agent, the required information must be placed in the mail or delivered within three business days. Reg. Z. § 226.19 (b), n. 45b.

**d.**     **Specific Disclosures Required for Variable Rate Loan:** Major aspects of the variable

rate loan program, which the consumer is considering, must be specifically disclosed.

1)    <u>The Index</u>: Identification of the index will be used to calculate the interest rate and a brief description of the method used in calculating the interest rate are required by the Regulation. § 226.19(b)(2)(ii).

2)    <u>Current Margin Value and Interest Rate</u>: A statement must be provided to the consumer suggesting the consumer ask for the current margin and interest rate. Reg. Z. § 226.19(b)(2)(iv).

3)    <u>Frequency of rate change and payment adjustment</u> must be disclosed. Reg. Z. § 226.19(b)(2)(vi).

4)    <u>Negative Amortization</u>: A statement to inform the consumer the consequences of negative amortization. A creditor must disclose the rules relating to the option, including the effects of exercising the option such as the increase of interest rate will occur and the payment amount will increase. Reg. Z. § 226.19(b)(2)(vii); commentary § 226.19(2). <u>Andrews v. Chevy Chase Bank</u>, 240 F.R.D at 620 (no violation found where the creditor informs the borrowers what will occur when the interest rate increases).

5)    <u>Conversion Feature</u>: If the loan has a conversion feature, the amount of fees will be charge and the method of the fixed rate interest to be determined must be disclosed. Reg. Z. § 226.19(b)(2)(vii)-3.

**e.    Historical Example Disclosure:** Creditors have the option to disclose the maximum interest rate and payment amount for a $10,000 loan amount <u>or</u> the historical example of changes in the index being used. U.S.C. § 1638; Reg. Z. 226.9(b)(2)(viii). If the former method is used, a statement that the periodic payment may increase or decrease substantially. Reg. Z. § 226.19(b)(2)(viii)(B).

**f.    Subsequent Disclosures:** Disclosures concerning rate adjustments are required for all variable rate loans. Reg. Z. § 226.19(b). Notice of the adjusted payment amount, interest rate, index rate, and loan balance is required to disclose to the borrower in a timely manner. Reg. Z. § 226.20(c)(1)-(4).

If payment adjustment may accompany interest rate adjustment, creditors are required to send borrowers notice at least 25, but not more than 120, days prior to the due date of a payment at the new interest rate. Notice is required to be sent to borrowers whenever there is an adjustment in interest rate. Reg. Z. § 226.20(c).

If interest rate adjustments are made without a corresponding payment adjustment, the

notice can be sent to the borrower once a year. Id.

Incorrect adjustment or used of index value or incorrect disclosing the new payment amount that does not comport with the contract terms violate TILA requirements, giving rise to statutory and actual damages. U.S.C. § 1640(a).

Statute of limitations for an affirmative violation is "one year from the date of the occurrence of the violation" that starts running when the erroneous notice is sent. U.S.C. § 1604(e).

**6.** **Required Disclosure of Rescission Rights:** Rescission rights arise when the transaction is a consumer credit transaction, in which a non-purchase lien or security interest is placed on the consumer's principal dwelling unit. TILA rescission remedies reflect Congress' intent to keep homeowners from placing their homes in jeopardy without a reasonably clear understanding of the financial risks and benefits of the transaction.

**a.** **Rescission right** is vested in the owner of the property that is the subject of the security interest. Reg. Z. §§ 226.15(a)(1)(i), 226.15(b), 226.23(a)(1).

**b.** **The security interest** must be the principal residence of the owner of the interest. Reg. Z. § 226.2(a)(11).

**c.** **Time of Delivery**: The rescission notice may be given after consummation, though the rescission period does not begin to run until it is effectively delivered. Official Staff Commentary § 226.23(b)-4. It is not effectively delivered until it is given in a form the consumer can keep. Reg. Z. § 226.15(b). A written acknowledgement of receipt of rescission notice creates a rebuttable presumption of delivery. Cole v. Lovett, 672 F. Supp. 947 (S.D. Miss. 1987).

**d.** **Providing Rescission Notice:** Each person who has the right to rescind a credit transaction must be provided two copies of rescission notice and the required disclosures in a credit transaction. U.S.C. § 1635(a); Reg. Z. §§ 226.5(b), 226.15(b). Notice of the right to rescind is also required for non-purchase money mortgages. U.S.C. § 1635(a). Giving the TILA notice and another notice of rescission at the same time, which have different rescission dates, confuses an ordinary consumer, violating the "clear and conspicuous" disclosure requirement. Jones v. Ameriquest.

**e.** **Time to Exercise Rescission Right**: The consumers have until midnight of the third business day following the delivery of the rescission notice, the transaction, or the receiving of the Truth-In-Lending statement, whichever occurs last. See, Jones v. Ameriquest. Right to

rescind can be exercised prior to the consummation of the loan. <u>Community Mutual Sav. Bank v. Gillen</u>, 655 N.Y.S.2d 271 (City Ct. 1997) (the consumer properly rescinds her loan at closing recovering fees paid to the creditor).

If the creditor fails to deliver the required notice of material disclosures, the consumer's right to rescind is automatically extended from three business days to three years. Reg. Z. § 226.23(a)(3).

**f.      Assignee's Liability:** An assignee is liable for statutory damages for violations by failure to disclosure TILA requirements by its predecessors and its own violation if it fails to respond properly to a rescission notice. <u>Palmer v. Champion Mortg.</u>, 465 F.3d 24, 27 (1st Cir. 2006) ("if a creditor does not respond to a rescission request within twenty days, the debtor may file suit in federal court to enforce the rescission right). <u>See also</u> U.S.C. § 1635(b).

**g.      Rescission Process:** The consumer must send a written notice to the creditor to trigger the rescission process. When the notice of rescission has been mailed, the notice is considered given. Reg. Z. §§ 226.15(a)(2), 226.23(a)(2).

When the consumer rescinds, the security interest automatically becomes void. The consumer is relieved of any obligation to pay any finance charge or any other charge. U.S.C. § 1635(b); Reg. Z. §§ 226.15(d)(1), 226.23(d)(1). Rescission voids the mortgage and is a complete defense to foreclosure. <u>Yslas v. K.K. Guenther Builders, Inc.</u>, 342 So.2d 859 (Fla.2d D.C.A. 1977). <u>See</u> <u>Beach v. Great Western Bank</u>, 670 So.2d 986 (Fla. 4th  D.C.A. 1996).

The creditor has twenty days from receipt of the consumer's rescission notice to return any money or property given to anyone and to take appropriate and necessary action to reflect the termination of the security interest. U.S.C. § 1635(b); Reg. Z. §§ 226.15(d)(2), 226.23(d)(2).

After the creditor has complied with the preceding mandate, the consumer tenders back to the creditor any money or property received. U.S.C. § 1635(b); Reg. Z. §§ 226.15(d)(3), 226.23(d)(3).


### OTHER AVAILABLE REMEDIES

Only creditors are subject to the civil penalties of TILA. U.S.C. § 1640(a). Civil damages are appropriate when disclosure requirements have been violated, and liability is imposed despite the creditor's alleged good faith and reasonableness. <u>Ratner v. Chemical Bank N.Y. Trust Co.</u>, 329 F. Supp. 270 (S.D.N.Y. 1971).

1.      <u>**Statutory Damages**</u>

Violations of the general requirements and rescission requirements give rise to statutory damage claims. U.S.C. § 1640(a). For open-end credit transactions, statutory damages are awarded in the amount twice of the amount of finance charge. If the action arises out of a credit transaction secured by a dwelling, the consumer is entitled to a minimum award of $200 but not more than $2,000. U.S.C. § 1640(a)(2)(A)(i-iii). Only one statutory recovery is allowed even there are multiple disclosure violations in a transaction. U.S.C. § 1640(g).

2.      <u>**Attorney's Fees**</u>

Consumers are awarded attorney's fees in a successful action or when they are "determined to have a right of rescission under section 1635," even if the consumer is not obligated to pay his or her attorney. U.S.C. § 1640(3); <u>Andrews v. Chevy Chase Bank</u>, 240 F.R.D. at 621 ("because […] plaintiffs have a right of rescission, they are entitled to attorneys' fees"); <u>Kessler v. Associates Financial Servs. Co. of HI, Inc.</u>, 639 F.2d 498, 499 (C.A. Hi. 1981) (attorney's fees are awarded even the plaintiffs are represented without charge by legal services attorneys). Attorney's fees include the cost of the action and "a reasonable attorney's fee as determined by the court." U.S.C. § 1640(3).

3.      <u>**Actual Damages**</u>

A consumer is entitled for actual damages when a creditor fails to comply with the requirements imposed by TILA, in the amount equal to the sum of any actual damage sustained by the consumer as a result of the creditor's violation. U.S.C. § 1640(a)(1). Courts may require the consumer to show actual reliance upon the accuracy of the disclosures in order to claim actual damages. <u>Perrone v. General Motors Acceptance Corp.</u>, 232 F.3d 433, 435-439 (5th Cir. 2000); <u>Peters v. Jim Lupient Oldsmobile Co.</u>, 220 F.3d 915, 917 (8th Cir. 2000) (detrimental reliance is established when the plaintiff shows that she read and understood the disclosures and that if the disclosures have been accurate, she would have sought and obtained a lower loan).

## BREACH OF CONTRACT

Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

Plaintiffs held a mortgage serviced through Defendants.

Plaintiffs sought to modify their monthly payments based on Defendant's participation in the HAMP or another loan modification program. Plaintiffs provided all the necessary documentation requested by Defendant in a timely manner in order to participate in a modification program.

Defendant informed Plaintiffs that they could begin the trial modification period and make modified interest payments immediately, without disclosing the possibility of negative consequences to their mortgage payment history, and under the expectation that they would receive a permanent modification under the HAMP or other loan modification program thereafter and/or submitted Plaintiffs to a Loss Mitigation Program to later denied them a loan Modification.

While Plaintiff were in the Loss Mitigation program Defendants filed foreclosure complaints against them, this constitutes Dual Tracking and it's prohibited by law.

In other cases, Defendants denied Plaintiffs of their right to be qualified for a Loss Mitigation program.

Plaintiffs agreed to Defendant's offer and made the modified payments based on Defendant's representations about the trial modification agreements, keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary, or are excused from performance because of Defendant's non-performance as alleged herein.

Defendant accepted Plaintiffs' modified offer of reduced payments throughout the trial period.

Plaintiffs' modified payments during the trial period constitute consideration and by making those payments Plaintiffs gave up their ability to pursue other alternatives to prevent default of their mortgage payments and foreclosures.

Plaintiffs and Defendants therefore formed a valid contract concerning the modification of their mortgage payments.

Defendant did not perform in accordance with the contract terms regarding the trial modification period, and in fact, Defendants intentionally and systematically delayed converting the trial modifications into permanent modifications and instead demanded additional documentation already sent and failed to implement as required under the loan modification programs adequate procedures and systems to respond to customer's inquiries and complaints.

Instead of fulfilling their obligations under the contracts formed with Plaintiffs, Defendants rejected Plaintiffs from the trial modification period, thereby nullifying and voiding their trial modification agreements, and demanded payments, late and default fees.

Even if Defendants did not breach an express term of the trial modification period agreement, it breached an implied term that required it to extend offers for permanent modifications within a reasonable time period following Plaintiffs' performance under the trial modification agreements. At the very least Defendants should not penalize them for their compliance with the modified payments with exorbitant payments and charging them late and delinquency fees, and reporting them to credit bureaus as in default -- all of which placed Plaintiffs in a materially worse position than before entering the contract with Defendants. Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make their modified payments.

As a direct and proximate result of Defendant's breach of these material terms that they falsely and misleading represented, Plaintiffs did not receive the benefit of their bargain and were damaged and are threatened with additional harm, in an amount to be determined at trial.

## ALLEGATION ON ROBO SIGNING

A lender cannot initiate a foreclosure proceeding under Puerto Rico Law immediately, they have to wait for the 120-day delinquency term to expire and by Federal and Local Law the lender or servicer have to give the debtor the chance to go through the Loss Mitigation process, before foreclosing their home.

This cases are  clear violations of Plaintiffs rights, they never were given the chance to cure the arrears.  Defendants never gave Plaintiffs the opportunity to submit themself to Loss mitigation, offered her a Loan Modification, Short Sale, Reinstatement or Repaying plan.

In some of these cases, Defendants began foreclosure proceedings against the Plaintiffs even when the Plaintiffs were not in arrears. In those cases, the Plaintiffs were prevented from continuing to pay their mortgages and even, threatened, harassed and/or evicted the Plaintiffs form their homes. These actions are against the law.

All this harassment still continues and is taking a toll in the Plaintiffs physical and mental health. During all this time the Defendants, their servicers and their personal have been harassing and sometimes, verbally abusing the Plaintiffs, tried to force them to sign agreements in order to evade their responsibility and negate their wrong doing.

Obviously before the actual facts of the case, it was clear that proceeds the Payment of defense.

In judicial foreclosure states, like in Puerto Rico, the foreclosure process requires the lending institution to authorize (via submission of verified documents and written statements

signed under affidavit by a bank official) the fact that the homeowner has defaulted on a mortgage the lender owns. The purpose of this process is to restrict the possession of houses by the bank in case a bank is not able to prove the ownership of a particular mortgage or if the homeowner has not defaulted to the level laid out in the foreclosure papers.

In 2010, in the wake of the mortgage crisis, the robo-signing scandal appeared. In those cases, a number of banking giants including Wells Fargo, JPMorgan Chase & Co., Bank of America Corp., and Citigroup Inc., regularly used false affidavits that had been signed by bank officials without the required review and verification of documents. The term 'robosigner' emerged as a result of the fact that banks were speedily approving numerous foreclosure documents without true knowledge. As a result, many homes were forced into improper foreclosure. In 2012, Wells Fargo (along with other financial institutions) reached a settlement for $25 billion for charges of faulty documents and other negligent foreclosure practices.

It is clear that Defendants initiated a foreclosure against the Plaintiff without the required review and verification  of documents.

**REMEDIES UNDER APPLICABLE LAWS AND REGULATIONS**

   A.    "Real State Settlement Procedures Act" (hereinafter "RESPA") and Regulation X of the "Consumer Financial Protection Bureau"

In 2010, the United States Congress approved the "Dodd-Frank Wall Street Reform and Consumer Protection Act," PL 111-203, 12 U.S.C. § 5301, et seq., In order, inter alia, to promote the financial stability of the United States by fostering accountability and transparency of the financial system. To this end, the Consumer Financial Protection Bureau (hereinafter "CFPB") was created, a federal agency that was delegated the authority to regulate everything related to consumer protection in the financial sector.

As part of the general authority delegated to the CPFB, that agency would be in charge of regulating, supervising and enforcing the provisions of the "Real Estate Settlement Procedures Act", known as RESPA. RESPA imposes on mortgage creditors and mortgage servants the duty to provide debtors with information about the nature and costs of mortgage debt and also imposes the duty to respond to qualified written requests (QWR's) which the debtors may file.

Between 2012 and 2013, the CFPB proposed a number of amendments to Regulation X, including that for the first time some rules relating to the process of "loss mitigation" or mitigation of losses of mortgage debtors. On the proposal Section 1024.41, the CFPB explained the following. We emphasize what is pertinent to this case:

> "[T]here has been widespread concern among mortgage market participants, consumer advocates, and policymakers regarding servicers' performance of the mitigation activity in connection with the mortgage market crisis. In response, servicers, investors, guarantors, and State and Federal regulators have undertaken efforts to adjust servicer loss mitigation and foreclosure practices to address problems relating to the evaluation of mitigation options.
>
> [...]
>
> The Bureau has considered a number of different options for addressing consumer harms relating to loss mitigation. [...]
>
> At the outset, it is worth noting that the Bureau's goal is not to achieve any particular target with respect to the number or speed of foreclosures. The Bureau's goal is rather to ensure that borrowers are protected from harm in connection with the process of evaluating the borrower for a mitigation option and proceeding to foreclosure. For instance, a borrower should not be misled about the options available to the borrower or the steps necessary to seek evaluation for those options. Further, servicers should review complete mitigation applications and make appropriate decisions with respect to those submissions.
>
> [...]
>
> By establishing appropriate mitigation procedures, the Bureau can ensure that borrowers receive information about the mitigation options available to them and the process for applying those options. Further, borrowers should be protected by ensuring that borrowers receive an evaluation for which they may be eligible, have an opportunity to appeal decisions by the servicer regarding loan modification options, and are protected from foreclosure until the process of evaluating the borrower's complete Loss mitigation application has ended.

[...]

Accordingly, proposed § 1024.41 requires servicers that make mitigation options available to borrowers in the ordinary course of business to undertake certain duties in connection with the evaluation of borrower applications for loss mitigation options. Proposed § 1024.41 is designed to achieve three main goals: First, proposed § 1024.41 provides protections to borrowers to ensure that, to the extent a servicer offers loss mitigation options, borrowers will receive timely information about how to apply and that the complete application will be Evaluated in a timely manner. Second, proposed § 1024.41 prohibits a servicer from proceeding with the end of the foreclosure process - that is, the scheduled foreclosure sale- until a borrower and a servicer have terminated orders regarding loss mitigation options. Third, proposed § 1024.41 sets timelines that are designed to be completed without requiring a foreclosure suspension date to avoid strategic use of these procedures to extend foreclosure timelines and delay investor recovery through foreclosure. 77 Fed. Reg. 57200, p. 57265-57267. (Emphasis supplied).

The final regulations on "Loss mitigation", contained in 12 C.F.R. § 1024.41, entered into force on January 10, 2014 and regulates in detail the presentation and evaluation of loss mitigation requests. In order for a mortgagee or mortgagee to be able to evaluate a loss mitigation request, it must be complete ("complete loss mitigation application"). And, as the statute indicates, if the debtor has not submitted a complete application within thirty-seven (37) days prior to the date of the sale at public auction, the mortgagee would have no obligation to consider it under this regulation.

This new regulation also provides that when a debtor files an incomplete loss mitigation request, the mortgagee must notify the debtor, within a period of five days, whether the application is complete or incomplete. 12 C.F.R. § 1024.41 (b) (2) (i) (B). In those cases in which the lack of documents necessary to evaluate the application is notified, the new rules provide that, if the debtor submits all documents requested, the application must be considered "facially complete". In such a situation, if the creditor then discovers the need for additional information or corrections to documents previously submitted to complete the application, the creditor must: (1) require the debtor to provide missing information or documents with relevant

corrections; (2) treat the application as if it were completed until the borrower has been given a reasonable opportunity to complete the application. 12 C.F.R. §. 1024.41 (c) (2) (iv). In addition, this recent regulation provides that if the creditor or mortgage agent denies the loss mitigation request, he must notify him in writing with the specific reasons for the denial. 12 C.F.R. § 1024.41 (d).

However, it is necessary to note that "[n]othing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific mitigation option". 12 C.F.R. § 1024.41 (a). (Emphasis supplied). Section 1024.41 on Mitigation of Losses of Regulation X only provides the debtor with an action for damages against the creditor or mortgage agent who has violated it. 12 U.S.C. § 2605 (f).

After a thorough analysis of the set of provisions governing the "Loss Mitigation" procedure, it is necessary to conclude that if the Plaintiffs were to comply with all the requirements outlined in Regulation X and RESPA, the Defendants would be placed, not only in the legal obligation to consider the Plaintiffs' request for loss mitigation, but also, if the Defendants refused to comply with the protocol, appearing would be in their full right to initiate the corresponding claim action for damages.

Therefore, we respectfully understand that the pattern of evasion by the Defendants to provide the Plaintiffs with the protection that the state and federal law protect, have no place in our system of law, since they pursue the sole purpose of evading their responsibility as creditors to the detriment of the right of the appearing Plaintiffs to protect their property under the current legal order.

We humbly consider that the evasion by the Defendants of its liability is detrimental to the economic situation of the Plaintiffs, since the uncertainty it is experiencing prevents it from

establishing a short-term and long-term financial plan. In turn, offer the Defendants' institution the opportunity to collect the debt in question. That is why we request from this Honorable Court to grant the conclusion of an Evidentiary View in order to evaluate in detail the qualification of those appearing for the benefits of the aforementioned federal regulations.

Therefore, we understand that this Honorable Court, responding to the call of justice in a relatively new scenario, must conclude that the acts carried out by the Defendants with respect to the controversy of epigraph have consisted in a systematic neglect for the sake of To circumvent a mechanism created by legislative will with the intention of safeguarding the right of the Plaintiffs to preserve their property.

B.  The Home Affordable Modification Program ("HAMP")

The Home Affordable Modification Program (HAMP) is designed to help financially struggling homeowners avoid foreclosure by modifying loans to a level that is affordable for borrowers now and sustainable over the long term. The program provides clear and consistent loan modification guidelines that the entire mortgage industry can use. The Home Affordable Modification Program includes incentives for borrowers, servicers and investors.

C. The Home Affordable Refinance Program ("HARP")

The Home Affordable Refinance Program ("HARP") was created by the Federal Housing Finance Agency specifically to help homeowners who are current on their mortgage payments, but have little to no equity in their homes, refinance their mortgage - that is, they owe as much or more than their homes are currently worth - are eligible for a HARP refinance.

D.  Puerto Rico Law No. 184 of August 17, 2012

The "Principal Residence Protection and Mandatory Mediation in Foreclosure Proceedings Act", Puerto Rico Law No. 184 of August 17, 2012 ("P.R. Law No. 184") creates a

mandatory mediation process between mortgagors and mortgagees into foreclosure processes of

residential properties in Puerto Rico.

   In the Statement of Motives of P.R. Law No. 184 it is stated the following:

"The People of Puerto Rico have been greatly affected by the economic crisis that both the Island and the United States have been undergoing during the last years.

The scarcity of economic resources in Puerto Rico has caused many homeowners to lose their homes to foreclosure initiated by the banking or financial institutions holding their property's mortgages.

In the United States, it is estimated that over nine million Americans will lose their homes to foreclosure within the next four years.

Goldman Sachs Group, one of the world's largest investment firms, estimates that, by 2014, foreclosure cases could exceed thirteen million nationwide, if the United States fails to take measures to solve the economic problems that foreclosure proceedings entail.

Puerto Rico's economic crisis has greatly affected our citizenry, who have been deprived of their right to own a home.

Most mortgage loans include acceleration clauses and other processes that protect any unpaid balance owed to the mortgagee.

The citizenry in general is not well aware of the technicalities and complex processes entailed by the legal obligations incurred under a mortgage loan; therefore, it requires further orientation with regard to such processes.

In light of the foregoing, the Administration of President Barack Obama created the Making Home Affordable Program (MHAP) to help mortgagors to refinance or modify their loans through two (2) programs:

(A) Home Affordable Refinance Program (HARP): Provides refinancing at lower interest rates to homeowners whose loans are guaranteed by Fannie Mae or Freddie Mac, including those who owe more than what their home is actually worth.

(B) Home Affordable Modification Program (HAMP): Provides mortgagors with incentives to modify their loans by reducing their loan's interest rate, extending their loan's term, or lowering their mortgage payments up to 35% of their gross income.

The United States Congress introduced Senate Bill 2912, entitled "Foreclosure Mandatory Act of 2009," in order to require mortgagors of loans with Federal guarantees to submit to a mandatory mediation process, before the mortgagee initiates a foreclosure proceeding.

Just as the Federal Government, the Commonwealth Government shall contribute and seek alternatives to reduce the number of foreclosure proceedings and prevent, to the extent possible, our citizens from losing their properties. The truth is that alternatives are available, but the people are not aware of them.

Nine states of the United States of America have approved this mandatory mediation process to be held before the courts of justice or other mandatory non judicial processes in order to seek alternatives and prevent banks or financial institutions from initiating foreclosure proceedings.

For all of the above reasons the Legislative Assembly of Puerto Rico shall enact a law to establish a foreclosure mandatory mediation process to be held in the courts of justice or the appropriate administrative forums before a foreclosure proceeding against a principal residential property in Puerto Rico is initiated by any banking institution. Principal Residential Property shall be understood as the property used as principal home, not as a second home; and, for property tax purposes, it shall be understood as the main residence or that which would qualify for a tax exemption".

E.  Puerto Rico Law No. 169 of August 9, 2016

Puerto Rico Law No. 169 of August 9, 2016,  creates the "Mortgage Debtor Assistance Act" in order to require the creditor of an overdue mortgage loan, that prior to initiating any legal proceeding that may lead to a claim for money collection and foreclosure, offer the debtor the loss mitigation alternative and only after that process has been fully completed and the mortgage debtor knows whether or not he qualifies for such alternative, then the mortgagee may begin a legal process in the courts of the Commonwealth of Puerto Rico; among other purposes.

F. Negligence

The Defendants and/or their authorized representatives have acted negligently in the management of the Defendants mortgages.

At all times relevant herein, the Defendants, acting as Plaintiffs' lenders and loan servicers, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited, accurate crediting of payments made by Plaintiffs and act diligently and fairly in compliance with applicable rules and regulations.

In taking the actions alleged above, and in failing to take the actions as alleged above, Defendants breached their duty of care and skill to Plaintiffs in the servicing of Plaintiffs' loans by, among other things, failing to properly and accurately credit payments made by Plaintiffs

toward the loans, filing claims and foreclosing proceedings without having the legal authority and/or proper documentation to do so.

As a direct and proximate result of the negligence and carelessness of the managing of Plaintiffs' accounts, claims and/or foreclosure proceedings by the Defendants, Plaintiffs suffered general and special damages in an amount to be determined at trial.

G. Fault of Diligence

The Defendants were not diligent in properly investigating the state of affairs of the management of Plaintiffs' accounts in the present case.

H. Count Under Puerto Rico State Law

The Defendants failed to comply with Puerto Rico Laws 184 of 2012 and Law No. 169 of 2016.

Also, Defendants come obliged under Puerto Rico Civil Code Sections 1802 and 1803 to pay for its gross negligence and recklessness in the mortgage handling and actions against the Plaintiffs in this case.

Their actions have cause material, physical and mental damages to Plaintiffs.

**PRAYER FOR RELIEF**

The Plaintiffs state that the damages suffered were product of a faulty and / or negligent handling of Plaintiffs' mortgages by the Defendants, their representatives and authorized officials.

Defendants' actions have cause great suffering and emotional distress to Plaintiffs.

The Plaintiffs had not been able to live peacefully and quietly since the start of the lawsuits and/or foreclosure proceedings.

The Plaintiffs had mental anguishes and sufferings as a result of the lawsuits and/or foreclosure proceedings brought against them.

Defendants directly or indirectly through them, their loan servicers, employees and representatives, have been continually harassing the Plaintiffs by requiring them pay inexistent or inaccurate arrears, to communicate with them and threatened to foreclose their property.

All these negligent acts have destroyed the spirit and strength of the Plaintiffs. They have caused moral damages; anguish and mental suffering that must be compensated by this Honorable Court.

For all the above-mentioned facts, we understand that under Sections 1802 and 1803 of Puerto Rico Civil Code in force the claimant debt to pay for its gross negligence and recklessness in the mortgage handling and actions of the Defendants in this case.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated pray for judgment against Defendant as follows:

A.  An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class Members;

B.  Restitution to Plaintiffs and Class Members;

C.  Actual damages for injuries suffered by Plaintiffs and Class Members;

D.  An order declaring the alleged acts and practices of Defendants to constitute a breach of contract and a breach of the covenant of good faith and fair dealing;

E.  An order for Defendants' specific performance of its contractual obligations together with other relief required by contract and law;

F.  Reasonable attorneys' fees and the costs of this action;

G.  Statutory pre-judgment interest;

H.    Award Plaintiff damages against all Defendants, jointly and severally, in an amount no less than $400,000,000.00 to be proven at trial together with prejudgment interests, costs and attorney fees.

I.    Such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

**RESPECTFULLY SUMBITTED** this 5th of April, 2017.

*S/VANESSA SAXTON-ARROYO* USDCPR 216509
P.O. Box 191590, San Juan, PR 00919-1590
787-765-4961, Email: vanessa.saxton@capr.org

*S/GWENDOLYN MOYER ALMA* USDCPR 216202        *S/JOSEPH GIERBOLINI,* USDCPR 229014
Vistas del Bosque 216 C/Real Bayamón PR 00956        PO Box 191620 San Juan, PR 00919-1620
gmoyeralma@gmail.com, 787-638-5870        787- 225-5367, juriszone@capr.org